UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                :
UNITED STATES OF AMERICA,                                       :
                                                                :
        -v-                                                     :
                                                                :        23-CR-159 (NRM)
ALEX RICAURTE CRUZ,                                             :
                                                                :        **MEMORANDUM &**
                                Defendant.                      :        **ORDER**
                                                                :
------------------------------------------------------------------X

**NINA R. MORRISON**, United States District Judge:

Presently before the Court is a motion by Defendant Alex Ricaurte Cruz ("Cruz") to suppress (1) the contents of electronic devices seized and searched pursuant to an August 23, 2021 warrant; (2) statements he made during an interrogation at his home on August 24, 2021; (3) statements he made during an interrogation at the FBI's New York office on April 13, 2023; and (4) the fruits a search of his cell phone conducted with his purported consent on April 13, 2023. The Court has considered the parties' briefs, the testimony and exhibits presented at an evidentiary hearing held on April 30, 2026, and the parties' oral arguments before the Court on March 20, 2026 and May 20, 2026.

In this opinion, the Court resolves only the Fifth Amendment claims raised in Cruz's motion. For the reasons outlined below, Cruz's motion to suppress various statements he made to law enforcement is granted in part and denied in part. Specifically, Cruz's motion to suppress the statements he made during the August 24, 2021 interrogation at his home is granted. As explained further below, this aspect

1

of his suppression motion is granted because, under the totality of the circumstances, the Court finds that Cruz was in custody when he was interrogated by multiple armed FBI agents in a back bedroom of his home for over an hour, and was not provided with *Miranda* warnings at any time prior to or during that interrogation.

However, Cruz's motion to suppress the statements he made while in FBI custody on April 13, 2023 and after being advised of his Fifth Amendment rights is denied. While the Court agrees with Cruz that this second interrogation was likely part of a deliberate, two-step strategy by law enforcement to evade *Miranda*'s requirements in the wake of an earlier, unconstitutional custodial interrogation at his home, *Missouri v. Seibert*, 542 U.S. 600 (2004), the twenty-month gap between these two events, combined with other curative measures undertaken by law enforcement at the time, precludes this Court from finding that the latter statements were obtained unlawfully.

The Court reserves decision on Cruz's Fourth Amendment claims challenging the constitutionality of the August 23, 2021 warrant and the April 13, 2023 search of Cruz's cell phone.

**FACTUAL BACKGROUND**

The Court makes the following findings of fact based on the exhibits offered by the parties through their briefing on the motion to suppress as well as the testimony and evidence adduced at a limited evidentiary hearing conducted under *Franks v. Delaware* that was held on April 30, 2026. *See* Dkt. Order dated Mar. 19, 2026; Min. Entry dated Mar. 20, 2026 (order scheduling *Franks* hearing); Hr'g Tr. dated Apr. 30,

2

2026 ("Hr'g Tr.") at 10:14–19:3, ECF No. 57[1] (detailing reasons why the Court had determined that a *Franks* hearing was appropriate and the issues to be covered at that hearing).

Much of the factual record relevant to this motion is not in dispute between the parties. The Court notes, however, that at a conference held on March 3, 2026, the government took the position that, insofar as Cruz's version of events may differ in certain respects from those of the officers on the scene, even if the Court were to credit Cruz's account, he was nevertheless not entitled to relief. Accordingly, with the parties' joint consent, the Court did not hold an evidentiary hearing to resolve those potentially disputed facts, and instead (1) presumed, for purposes of the instant motion, all the facts asserted by Cruz in his declaration in support of the motion to be true; and (2) conducted only a limited *Franks* hearing for the purpose of assessing whether certain statements and/or omissions in Agent Jensen's affidavit in support of the April 2021 search warrant comported with the Fourth Amendment.

## I. FBI Investigation

In May 2020, law enforcement officers initiated a child exploitation investigation after learning of a nine-year-old girl ("Complainant-1") who was induced by another social media user to engage in explicit communications over various cell-phone applications. *See* August 23, 2021 Warrant Affidavit, Cruz Mot. to Suppress Ex. A ("Aug. 23, 2021 Warrant Aff.") ¶ 7, ECF No. 41-1. According to Federal Bureau of Investigation ("FBI") Special Agent Elizabeth Jensen ("Agent

---

[1] References to this transcript use internal pages and lines, not ECF pagination.

Jensen"), a consensual review of Complainant-1's phone revealed communications in which a social media user repeatedly asked Complainant-1 to send explicit images and expose herself on video calls over various platforms. *Id.* ¶¶ 9–19. During these exchanges, the social media user provided Complainant-1 with a phone number ending in -1304 (the "-1304 number"). *Id.* ¶ 11. Based on their review of Complainant-1's cell-phone records, investigators concluded that Complainant-1 placed or received video calls from the -1304 number on a handful of later dates. *Id.* ¶ 19.

This investigation was initiated by the FBI field office in Illinois, which intended to conduct the investigation and originally only requested assistance from the New York field office. Hr'g Tr. at 26:2–27:2; Gov't Ex. A, ECF No. 64-15 (emails documenting the original request for assistance). At the time the Illinois field office requested assistance from the New York field office, the FBI considered Cruz's brother, William Quinonez ("Quinonez"), to be the subject of the investigation. Hr'g Tr. at 27:17–21.

Around six months after their investigation began, law enforcement officers learned of a second girl ("Complainant-2") who was asked to engage in sexually explicit conversations over social media, this time through the gaming and chat application Hago Lite. Aug. 23, 2021 Warrant Aff. ¶ 20–21; Gov't Ex. 4 at 4,[2] ECF No. 64-10 (indicating that a complaint was made in Pinellas County, Florida on November 9, 2020 and subsequently referred to New York law enforcement on

---

[2] References to the parties' hearing exhibits use internal pagination.

February 23, 2021).  According to Agent Jensen, a consensual review of Complainant-2's cell phone revealed that Complainant-2 had sent a nude image to a Hago Lite user with the handle "Gato Colon."  Aug. 23, 2021 Warrant Aff. ¶ 22.  Chat logs showed that "Gato Colon" had asked Complainant-2 to contact him on Snapchat, an application for sharing ephemeral pictures and videos, at an account with the handle "ncolon3307."  *Id.* ¶ 23.  User records from Snap Inc. ("Snap") reflected that the "ncolon3307" account was created about a year earlier, in November 2019, using the -1304 number that had been given to Complainant-1.  *Id.* ¶ 24.

The mother of a third girl ("Complainant-3") came forward in February 2021 with reports that her daughter had exchanged sexually explicit messages with a Hago Lite user, "Camilo Colon."  *Id.* ¶¶ 26–27.  Through interviews with Complainant-3 and her mother, law enforcement learned that Complainant-3 had exchanged text messages and video calls with a person using the -1304 number.  *Id.* ¶ 23.  Because one of the later-identified complainants was in New York, the New York field office took over the investigation in February 2021.  Hr'g Tr. at 27:3–13.

After the case was transferred to the New York field office, Agent Jensen began investigating further.  The record shows that, early in the investigation, Agent Jensen made a series of requests for information about the possible owner/user(s) of the -1304 phone from certain government contacts.  On May 20, 2020, she obtained New York City Department of Education ("DOE") records that listed the -1304 number as the contact number for both of Cruz's children.  *Id.* at 42–45 (discussing these DOE records); Gov't Ex. B, ECF No. 64-16 (emails documenting this request and response).

Agent Jensen understood these DOE records to indicate that the -1304 number was listed as the contact for the children's parent or guardian — *i.e.*, Cruz — although she acknowledged that this was a conclusion she inferred from the information she received, and that the DOE itself did not indicate the relationship between the contact number and the students listed. Hr'g Tr. at 45:2–8. On May 20, 2020, she also requested and received from the United State Postal Service ("USPS") postal records that indicated Cruz and an individual named Jackeline Hernandez-Quino received mail at the 78-11 87th Road, Queens address that was also associated with the Cruz's brother, William Quinonez. *Id.* at 80:18–22; Gov't Ex. C, ECF No. 64-17 (emails documenting this request and response).

In January 2021, Agent Jensen received T-Mobile records for the -1304 number that included the 78-11 87th Road address. Hr'g Tr. at 28:10–24.[3] The T-Mobile records also indicated that the -1304 number was the "Contact 2" number for Quinonez's account, which Agent Jensen interpreted as meaning this -1304 number was the "secondary contact" on the account, *i.e.*, a number potentially used by someone besides Quinonez. *Id.* at 31–36 (discussing these T-Mobile records). These

---

[3] At the hearing, Agent Jensen indicated that the T-Mobile records initially established the address associated with Quinonez. Hr'g Tr. at 28:10–24. However, the T-Mobile records the government put into evidence at the hearing are dated January 15, 2021. Gov't Ex. 6, ECF No. 64-12. When Agent Jensen received the request for assistance from the Illinois field office on May 19, 2020, the request contained information about Quinonez, which included the 78-11 87th Road address and the -1304 number. Gov't Ex. A, ECF No. 64-15. Agent Jensen then used this address to request the Department of Education and United States Postal Service records, discussed *supra*, on May 20, 2020. Gov't Exs. B & C, ECF Nos. 64-16, 64-17. It thus appears that Agent Jensen was aware that Quinonez was associated with the 78-11 87th Road address before she received the T-Mobile records.

T-Mobile records alone did not conclusively establish who the user of the -1304 number was or whether the user lived at 78-11 87th Road. *Id.* at 36:5–25. However, these records do indicate that the -1304 number is listed as "Contact 2" for Quinonez. Gov't Ex. 6, ECF No. 64-12. The "Interpreting Subscriber Information" document in evidence, which defines the terms used in T-Mobile's records, indicates that "Contact 2" is the "[s]econdary contact phone number," as opposed to "Contact 1," which is the "[p]rimary contact phone number" for Quinonez's account. Gov't Ex. 5 at 2–3, ECF No. 64-11.

Agent Jensen then sent a subpoena to Uber Technologies Inc. ("Uber"), a company that maintains a ridesharing app that connects drivers with riders, for user records relating to the -1304 number and received a response from Uber on March 30, 2021. Hr'g Tr. at 37–40 (discussing the information received from Uber); Gov't Ex. 7, ECF No. 64-13 (records received from Uber). These records contained an email address, afrcruz527@gmail.com, that appeared to reference Cruz's initials and birthday. Hr'g Tr. at 39:13–23. This email address led Agent Jensen to conclude that Cruz was likely to be a user of the -1304 number. *Id.* at 40:2–24.

On an unknown date, Agent Jensen also obtained New York Department of Social Services ("DSS") records that listed Cruz's name, the 78-11 87th Road address, and the -1304 number. *Id.* at 41:2–42:3. Agent Jensen did not recall when she received these DSS records nor in what time period DSS interacted with Cruz at this address and number. *Id.* at 95:10–96:9. She also did not review the records herself; instead, a colleague told her orally what those records indicated. *Id.* at 94:14–95:9.

7

The records themselves were not produced by the government at the hearing. *Id.* at 94:9–95:5.

Agent Jensen's investigation also involved information obtained by the New York Police Department ("NYPD"). Hr'g Tr. 41:10–16. On March 25, 2021, two detectives from the NYPD's Computer Crimes Squad conducted an investigative interview of Quinonez at his residence and documented the interaction in a DD-5 police report (the "DD-5"). ECF No. 49-1. During this interview, Quinonez identified himself and, according to the DD-5, responded "yes" when asked if the -1304 number was "his." *Id.* at 1[4] (stating that detective "asked [Quinonez] if his phone number was [the -1304 number] and again he stated yes").[5] During the interview, Quinonez informed the detectives that the NYPD had previously come to his home to interview him approximately a month and a half earlier, that he was represented by counsel, and that his attorney had already told the NYPD not to question him any further. *Id.* Quinonez also told the detectives that his lawyer would call them and requested a business card from one of the officers. *Id.* After this interview, the NYPD closed its investigation into Quinonez, citing exhaustion of investigative leads. Gov't Ex. 4 at 12–13, ECF No. 64-10 (documenting that the case was closed on March 25, 2021).

Agent Jensen reviewed the DD-5 summarizing the NYPD's interview(s) with Quinonez in March 2021 on or about July 12, 2021. Hr'g Tr. at 46:7–9. She then attempted to gather more information about Quinonez's statement that the -1304

---

[4] Unless otherwise indicated, references to the record use ECF pagination.

[5] The DD-5 includes the full cell phone number in question, but the Court has redacted it here to protect the personal information of the phone's user(s).

number was "his," but these efforts were unsuccessful. *Id.* at 48–50 (discussing how Agent Jensen and an NYPD colleague could not locate one of the detectives listed on the DD-5 because he had retired, and that the second detective listed on the DD-5 had a limited recollection of the interview).

On July 17, 2021, Agent Jensen and at least one other colleague conducted physical surveillance of the 78-11 87th Road residence. Gov't Exs. 2, 2-A, 2-B, 2-C & 2-D, ECF Nos. 64-2, 64-3, 64-4, 64-5 & 64-6; Hr'g Tr. at 68–74 (discussing this surveillance). During this surveillance, Agent Jensen observed Quinonez's car parked in front of the residence and noted the residence's physical plant, including a detached two-car garage adjacent to the residence. Gov't Ex. 2, ECF No. 64-2. She also took photographs of the residence. Gov't Exs. 2-B, 2-C & 2-D, ECF Nos. 64-4, 64-5 & 64-6. Agent Jensen testified that she conducted surveillance on the residence on one other occasion and that another officer, Detective Harkins, surveilled the premises "on multiple occasions." Hr'g Tr. at 68:13–20. At the hearing, Agent Jensen testified that she did not recall seeing Cruz exit or enter the premises at any time while it was under surveillance. *Id.* at 106:22–24.

Following the July 17 surveillance, on July 30, 2021, Detective Harkins reviewed additional records pertaining to the 78-11 87th Road residence. Gov't Ex. 3, ECF No. 64-7. His review of Con Edison utility records indicated that there was one meter and one account, registered to Quinonez, associated with 78-11 87th Road. *Id.* at 1. His review of New York City Department of Buildings ("NYCDOB") records indicated that the two-car garage adjacent to the residence was not a part of 78-11

9

87th Road, *id.*, and revealed that the residence was classified as an "A5-1 Family Dwelling," Gov't Ex. 3-A at 1, ECF No. 64-8. The NYCDOB records also stated that this classification "shows a building's tax status, which may not be the same as the legal use of the structure" and instructed that, "[t]o determine the legal use of a structure, research the records of the Department of Buildings." *Id.* Agent Jensen testified that she "[did not] believe there was followup" concerning the residence's legal status. Hr'g Tr. at 124:3–7.[6]

On August 9, 2021, the government obtained a warrant authorizing the search of information associated with the "ncolon3307" Snapchat account from then-Magistrate Judge Sanket J. Bulsara. Aug. 23, 2021 Warrant Aff. ¶¶ 24, 29. Pursuant to that warrant, the government received records showing that "ncolon3307" attempted to engage in sexually explicit conversations with at least one other Snap user who identified herself as a minor girl. *Id.* ¶¶ 29–31.

---

[6] Cruz introduces several pieces of evidence that he asserts (1) Agent Jensen's investigation should have uncovered and (2) would have been relevant to the magistrate judge's evaluation of probable cause for the warrant to search Cruz's residence and electronic devices. This evidence includes (1) Automated City Register Information System ("ACRIS") property records concerning 78-11 87th Road, Hr'g Tr. at 81–82 (discussing these property records); Reply in Supp. of Mot. to Suppress ("Cruz Reply") at 7, ECF No. 47 (same); Cruz Reply Ex. B, ECF No. 47-1 (containing these records); (2) Department of Motor Vehicle ("DMV") records concerning Cruz, Hr'g Tr. at 97–98 (discussing these DMV records); Def. Ex. Q, ECF No. 63-18 (containing these records); and (3) two traffic incident reports involving Quinonez from 2002 and 2010 that Cruz asserts Agent Jensen would have found upon her records search in the NYPD Domain Awareness System ("DAS"), Hr'g Tr. at 87–90 (discussing these DAS records), and in which Quinonez listed the -1304 number as his own when asked for his contact information, Def. Ex. T, ECF No. 63-21 (containing these records).

## II. The August 23, 2021 Search Warrant

On August 23, 2021, Agent Jensen applied for and obtained a search warrant from Magistrate Judge Roanne Mann for the 78-11 87th Road address, where Cruz lived in the basement with his two sons. *See generally* Aug. 23, 2021 Warrant Aff.; *see also* Mem. in Supp. of Mot. to Suppress ("Cruz Mot. to Suppress") at 4, ECF No. 41; *id.* Ex. B, August 24, 2021 FBI ROI ("FBI ROI") at 1, ECF No. 41-1; *id.* Ex. E, Declaration of Alex Ricaurte Cruz ("Cruz Decl.") ¶ 1, ECF No. 41-1. The warrant was the result of multiple rounds of drafting, in which changes were made after consultations with Judge Mann before she ultimately signed the third draft warrant. *See* Hr'g Tr. at 52–67, 83:12–14, 124:9–19 (discussing this redrafting process and the changes made between drafts).

The warrant identified the premises to be searched by a description of the residence, its street address, and two exterior photographs. Aug. 23, 2021 Warrant Aff. Attachment A. It did not identify the building as a multi-family dwelling, nor did it limit the scope of the search to a specific unit. *See id.* In his motion to suppress, however, Cruz asserts that a publicly recorded mortgage document identified 78-11 87th Road as a two-family dwelling and that Agent Jensen would have discovered this fact had she conducted a reasonably diligent investigation into the premises before she submitted her affidavit to Judge Mann. *See* Reply in Supp. of Mot. to Suppress ("Cruz Reply") Ex. B, ECF No. 47-1.

The warrant authorized the seizure from that address of "[a]ll records constituting evidence or instrumentalities of violations of [18 U.S.C. §§ 2252 and

2252A] from January 1, 2020 through the present." Aug. 23, 2021 Warrant Aff. Attachment B. The warrant enumerated nineteen representative categories of such evidence, including images, books, magazines, and videos depicting child pornography, Aug. 23, 2021 Warrant Aff. Attachment B ¶¶ 1–4; records and communications related to the possession of child pornography, *id.* ¶ 5; billing and payment records reflecting access to websites related to child pornography, *id.* ¶ 6; and computers, including cell phones, "that contain records or information used as a means to commit violations of 18 U.S.C. §§ 2252 and 2252A," *id.* ¶ 15.

In a section titled "PROBABLE CAUSE," the warrant application detailed the above-described communications with minors by a person using multiple social media accounts. Aug. 23, 2021 Warrant Aff. ¶¶ 7–31. It also detailed agents' efforts to connect the accounts to the -1304 cell-phone number using various investigative techniques, *id.* ¶¶ 11, 24, 26, 29, and asserted investigators' belief that that -1304 number was Cruz's, *id.* ¶¶ 32–36.

Agent Jensen's affidavit in support of the warrant application offered three primary pieces of evidence in support of her assertion that the government had probable cause to believe that Cruz was "the user" of the -1304 number. First, relying on records investigators obtained from Uber, the affidavit noted that an Uber account associated with the -1304 number was registered to "Alex Ricaurte Cruz" and linked to an email address that appeared to contain Cruz's birth date and initials. *Id.* ¶ 33. Second, it stated that (undated) administrative records from the New York City DSS listed the -1304 number under the name "Alex Ricaurte." *Id.* ¶ 34. And third, it said

T-Mobile subscriber information "associated" the -1304 number with a person named "William Quinonez" at the warrant address, a person who investigators believed to be Cruz's brother. *Id.* ¶¶ 35–36. However, the warrant application did not mention the DD-5 from March 2021 which reported that Quinonez answered "yes" when he was asked by the NYPD whether the -1304 number was "his[.]"

Agent Jensen explained in the warrant application that Cruz was believed to reside at the warrant address based on her review of "law enforcement databases." *Id.* ¶ 22. She also stated her view, based on the same databases and what Agent Jensen described as "open[-]source social media records," that "approximately seven individuals" resided at the warrant address: Cruz, his two young-adult sons, his brother Quinonez, and three other adult family members. *Id.* ¶ 36. Agent Jensen did not include in the warrant application references to certain other information she had gathered relating to the residence and the -1304 number — some of which contained references to Cruz and/or Quinonez — including (1) the USPS records; (2) the DOE records; (3) the Con Edison utility records; and (4) the NYCDOB records.

Following Agent Jensen's assertions of probable cause, the next section of the affidavit set forth a generic description of so-called child pornography collectors' common characteristics. *Id.* ¶¶ 37–44.[7] Among these, Agent Jensen noted that people involved in child pornography offenses "frequently collect sexually explicit materials in a variety of media," *id.* ¶ 41; "frequently use cell phones and other mobile

---

[7] As authority for these pronouncements, Agent Jensen cited her "training and experience and conversations with other law enforcement officers." *Id.* ¶¶ 37, 41–44. These paragraphs of the warrant affidavit did not address facts specific to Cruz's conduct or law enforcement's investigation of him.

electronic devices," *id.* ¶ 42; and sometimes "store . . . child pornography throughout their premises," "in common spaces and on computers and electronic storage devices that can be accessed or used by others," *id.* ¶ 43. Because "a collector of child pornography may store and view child pornography on a shared computer," the application said, "there is no way to determine whether [a particular device]" might contain evidence of the offenses under investigation "[u]ntil [the device] has been examined." *Id.* ¶ 43.

Given the claimed difficulty of identifying suspect devices ahead of time, the warrant application sought "permission to search for records that might be found [at] the [warrant address] in whatever form," including on any "computer or storage medium." *Id.* ¶¶ 45–46; *see also id.* ¶ 46 (asserting probable cause to search any "computer or storage medium [] found" at the warrant address); Aug. 23, 2021 Warrant Aff. Attachment B ¶ 1 (seeking permission to seize "files containing images of child pornography and records . . . pertaining to . . . sexually explicit material relating to children . . . in whatever form they may be stored or found"). This request was not limited to "direct evidence" of the crimes under investigation. *Id.* ¶ 47. Instead, the application also sought leave to review "contextual information," including any evidence that might establish "how [devices] were used, the purpose of their use, who used them, and when." *Id.* ¶¶ 47, 47-d. Such an expansive authority was appropriate, in Agent Jensen's view, because evidence of dominion or control "may either inculpate or exculpate the . . . user" of a device. *Id.* ¶ 47-b.

14

Though Agent Jensen's affidavit claimed there was probable cause to take any "computer or storage medium . . . found at [the warrant address]," *id.* ¶ 46, the warrant itself included a series of contingencies purporting to limit which devices law enforcement could seize, depending on what else the officers might learn about the identity user of the -1304 phone during the execution of the warrant, *see* Aug. 23, 2021 Warrant Aff. Attachment B ¶ 18. These provisions were added to the warrant through the redrafting process before Judge Mann. Hr'g Tr. at 63–67 (discussing the addition of this contingent language).

Specifically, the warrant allowed the seizure of any devices that officers "reasonably believe[d]" belonged to the user of the -1304 phone. Aug. 23, 2021 Warrant Aff. Attachment B ¶ 18. It stated that such a belief could either rest on information acquired during the search or be derived by negative inference if an "item d[id] not . . . appear to belong to an individual who is *not* the user of the 1304 Phone." *Id.* (emphasis added). Put more simply, the warrant created a default presumption that any device found at the warrant address was the -1304 user's and could be seized, unless investigators had reason to believe that a device did *not* belong to that person. *Id.* Finally, even as it repeated officers' belief that Cruz was the -1304 user, the warrant addressed what law enforcement could do if information uncovered during the search revealed someone other than Cruz was the true suspect. It stated: "If law enforcement officers determine that an individual other than ALEX RICAURTE CRUZ is the user of the 1304 Phone, law enforcement officers will seize the devices belonging to the user of the 1304 Phone and will apply for an additional search

15

warrant prior to searching those devices." *Id.* In other words, if the officers on the scene confirmed that Cruz was in fact "the user" of the -1304 phone, the warrant permitted them to seize and search all of his devices; on the other hand, if they learned that someone other than Cruz was the -1304 phone's user, they were permitted only to seize that person's devices, but not to search their contents without a subsequent warrant.

### III.    Execution of the Warrant on August 24, 2021

At approximately 6:00 AM on August 24, 2021, thirteen federal task force agents arrived at Cruz's home. FBI ROI at 1; Cruz. Decl. ¶¶ 2–3. The agents wore vests emblazoned with "FBI" or "NYPD." Cruz Decl. ¶ 3. At least some of them were armed. Cruz Decl. ¶ 4; *see also* Gov't Opp'n to Mot. to Suppress ("Gov't Opp'n") at 15, ECF No. 44 (asserting that agents' "firearms were holstered" while interviewing Cruz following their entry pursuant to the warrant).

According to the government, upon arriving at the warrant address, agents identified themselves, knocked on the front door, and announced that a search warrant had been issued for the residence. *See* Gov't Opp'n at 14 (citing FBI ROI at 1). Cruz's brother Quinonez answered. *Id.* While agents performed a protective sweep of the home's upper floors, one of the occupants informed them that additional people lived in a downstairs basement, which was accessible through a separate door. *Id.*

Agents broke down Cruz's door and forcibly entered his apartment. Cruz Decl. ¶ 3; Cruz Mot. to Suppress Ex. K, Photographs of Cruz Apartment at 180, ECF No.

16

41-1. The agents entered the apartment with guns drawn, finding Cruz asleep on a sofa near the basement entrance. Cruz Decl. ¶ 5. Approximately four agents pointed their guns at him and ordered him to put his hands up while his sons, then ages seventeen and nineteen, came out of their bedrooms in response to the noise. Cruz Decl. ¶¶ 4, 6–9. The armed agents immediately ordered Cruz's sons out of the house. *Id.* ¶ 11.

## IV. Law Enforcement's August 24, 2021 Interrogation of Cruz

While some task force agents conducted a search of Cruz's home, three of them — FBI Special Agent Thomas Thompson ("Agent Thompson"), Agent Jensen, and NYPD Officer George Munoz — led Cruz to a bedroom at the back of the apartment to be interviewed. Cruz Decl. ¶ 10; Cruz Mot. to Suppress at 6. Two other armed agents positioned themselves at the entrance to Cruz's basement, blocking its only exit. Cruz Decl. ¶ 13. Cruz was not handcuffed during the questioning. Cruz Mot. to Suppress at 20; Gov't Opp'n at 15.

It is undisputed that the agents who questioned Cruz at length that day did not advise him of his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966). Cruz Decl. ¶ 18; Cruz Mot. to Suppress at 6. Nor did the agents offer Cruz a Spanish interpreter during the interrogation. Cruz Mot. to Suppress at 6. Instead, Agent Thompson instructed Cruz (in English) that he should seek clarification from another interrogating officer who also spoke Spanish (Officer Munoz) if he did not understand the agents' questioning. *Id.* at 6–7 (citing Cruz Mot. to Suppress Ex. C, Audio Recording of August 24, 2021 Interrogation ("First Interrogation Audio")). Agent

Thompson then told Cruz (again in English) that the agents had a search warrant, that Cruz was not under arrest and was "free to leave," and that the officers were only there to clear some things up. *Id.* at 7; Gov't Opp'n at 15. Cruz indicated that he did not understand: he responded "no" when asked if he understood what Agent Thompson had just said. Gov't Opp'n at 15. Officer Munoz translated parts of Agent Thompson's comments into Spanish. However, he did not tell Cruz in Spanish that he was "free to leave." Cruz Mot. to Suppress at 6; Cruz Reply at 14–15; Gov't Opp'n at 15.

The agents interrogated Cruz for over an hour. Cruz Mot. to Suppress at 9. In that time, they asked him about whether and when he used the -1304 cell phone and the suspect social media handles, showed him printed copies of chat logs and photographs of minors who were the suspected victims of online sexual exploitation, and claimed that they had knowledge of his online activity. *Id.* at 7–8. The agents also told Cruz that they "simply wanted to 'cross [him] off the list' of suspects." *Id.* at 7 (quoting First Interrogation Audio). And although officers told Cruz that he did not have to answer their questions, they repeatedly told him that lying to federal agents was a "federal crime." *Id.* at 8 (quoting First Interrogation Audio).

Cruz ultimately made statements confirming that he used the -1304 phone and the Snapchat account agents were investigating. Gov't Opp'n at 15. In addition to these statements, law enforcement agents left his home in August 2021 with (1) a Samsung Galaxy A12 cell phone (later identified as the -1304 phone); (2) a tablet; and (3) an SD card. *Id.* at 14; Cruz Mot. to Suppress at 9.

**V. The April 13, 2023 Post-Arrest Interrogation of Cruz, the *Miranda* Waiver, and the Consent-to-Search Form**

Agent Thompson returned to Cruz's home approximately twenty months later, on April 13, 2023, accompanied by other FBI and task force agents. Cruz Mot. to Suppress at 9; Gov't Opp'n at 16. The agents arrested Cruz pursuant to a warrant, handcuffed him, and brought him to the FBI's New York office where, still handcuffed, he was subjected to a second interrogation. Cruz Mot. to Suppress at 9; Gov't Opp'n at 16.

As in 2021, Agent Thompson led the second interrogation of Cruz. Cruz Mot. to Suppress at 9. This time, a Spanish interpreter was present. *Id.* Agent Thompson began the interview by invoking his prior August 24, 2021 interrogation of Cruz in Cruz's home. *Id.* (quoting Cruz Mot. to Suppress Ex. D, Audio Recording of April 13, 2023 Interrogation ("Second Interrogation Audio")); Gov't Opp'n at 19. An interpreter then read Cruz his *Miranda* rights in Spanish and presented him with a Spanish-language *Miranda* waiver, which Cruz signed. Cruz Mot. to Suppress at 9; Gov't Opp'n at 17–18; Gov't Opp'n Ex. A, April 13, 2023 *Miranda* Waiver, ECF No. 44-2.

Agent Thompson asked Cruz if a cell phone with a call number ending in -0478 (the "-0478 phone"), which agents had seized when Cruz was arrested, belonged to him. Cruz Mot. to Suppress at 10; Gov't Opp'n at 18. He also asked Cruz for the phone's passcode. Cruz Mot. to Suppress at 10; Gov't Opp'n at 18. After Cruz gave the passcode, Agent Thompson asked him for consent to search the device, presenting him with a written consent-to-search form, which he signed. Cruz Mot. to Suppress at 10; Gov't Opp'n at 18; *see also* Gov't Opp'n Ex. B, FBI Consent-to-Search Form,

ECF No. 44-2. According to Cruz, the interpreter translated Agent Thompson's request by asking only if Cruz gave consent to "see" or "look at" the phone, without conveying that Cruz could voluntarily decline or explaining the extent of the searches contemplated by the form. Cruz Mot. to Suppress at 10; Cruz Mot. to Suppress Ex. J, Translation of Excerpt of April 13, 2023 Interrogation at 178, ECF No. 41-1.

Moreover, although the consent-to-search form was in Spanish, it appears to have been filled in incorrectly. The words "Android cell phone [redacted] - 0478" appeared in the field for the signer's name, and the lines identifying devices for which the signer gave consent were blank. *See* Cruz Reply at 17; Gov't Opp'n Ex. B; Cruz Reply Ex. A, Translated FBI Consent-to-Search Form, ECF No. 47-1.

After the consent form was signed, Agent Thompson reprised his questioning of Cruz, again referencing the August 24, 2021 interrogation. Cruz Mot. to Suppress at 10. This pattern continued throughout the second interrogation, with Agent Thompson repeatedly referring to the topics, themes, and admissions obtained during the first interrogation of Cruz in his home. *Id.* at 10–11 (quoting Second Interrogation Audio). The interrogation ultimately led Cruz to make inculpatory admissions that the Government contend connect him to the cell phone and their child exploitation investigation. *See* Gov't Opp'n at 20.

## <u>PROCEDURAL BACKGROUND</u>

Cruz was indicted on April 11, 2023, ECF No. 1, and the indictment was unsealed on April 13, 2023, the same day Cruz was arrested, ECF No. 3. Cruz pled not guilty to all counts and was released on bond. ECF No. 4.

Cruz filed the instant motion to suppress on October 27, 2025, ECF No. 41, the government filed its opposition to the motion on December 10, 2025, ECF No. 44, and Cruz filed his reply on January 21, 2026, ECF No. 47.  At a status conference held on March 3, 2026, the Court requested the parties hold March 19 and 20, 2026 for oral argument on the motion, Min. Entry dated Mar. 3, 2026, and ultimately scheduled oral argument for March 20, Dkt. Order dated Mar. 9, 2026.

Upon further review of the parties' submissions, the Court concluded that it would hold a limited evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) as to certain issues raised in Cruz's Fourth Amendment claims, and that it would hear oral argument on Cruz's Fifth Amendment claims.  Dkt Order dated Mar. 19, 2026.  The Court held oral argument on the Fifth Amendment claims on March 20, 2026 and, that same day, scheduled an evidentiary hearing relating to the Fourth Amendment claims for April 30, 2026.  Min. Entry dated Mar. 20, 2026.  The hearing was held on April 30, Min. Entry dated Apr. 30, 2026, and the Court thereafter heard oral argument on the Fourth Amendment claims on May 20, 2026, Min. Entry dated May 20, 2026.

## **DISCUSSION**

### I.     **August 24, 2021 Pre-Arrest Statements**

Cruz first moves to suppress the pre-arrest statements he made to law enforcement during questioning in his home on August 24, 2021, contending that the statements were obtained in violation of the Fifth Amendment.  The Court agrees.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona* ruled that police may not interrogate a suspect who has been taken into custody without first warning the person 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)).

Law enforcement officers must provide a suspect with *Miranda* warnings before conducting a "custodial interrogation." *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011). The phrase "custodial interrogation" imposes two separate requirements: "(a) there must be an interrogation of the defendant, and (b) it must be while [he] is in custody." *Id.*

The first element, interrogation, occurs when "express questioning [is used], but also . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *FNU LNU*, 653 F.3d at 148 (interrogation is "express questioning or its functional equivalent").

The second element, custody, for "*Miranda* purposes is not coterminous with the colloquial understanding of custody." *United States v. Faux*, 828 F.3d 130, 135

(2d Cir. 2016) (quoting *FNU LNU*, 635 F.3d at 152–53).  In this context, the "test for determining custody is an objective inquiry that asks (1) whether a reasonable person would have thought he was free to leave the police encounter at issue and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest."  *Id.* (citation modified) (quoting *Newton*, 369 F.3d at 672).  A person must be seized to be in custody; however, a seizure alone is merely a "necessary, but not sufficient, condition" to establish custody.  *Id.*

Here, the government does not dispute that Cruz was subjected to "interrogation" within the meaning of the Fifth Amendment when he was questioned at his home in August 2021.  Gov't Opp'n at 30 n.5.  But the government maintains that Cruz was not "in custody," and thus, that the agents had no obligation to advise him of his *Miranda* rights and obtain a knowing and voluntary waiver of those rights prior to interrogating him.  *Id.* at 31–35.

The custody determination requires courts to consider the totality of the circumstances of a suspect's encounter with law enforcement.  *FNU LNU*, 653 F.3d at 153.  Aside from a formal arrest, courts have identified the following factors as particularly relevant for a custody analysis: "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion."  *Id.*

23

Generally, neither the suspect's nor the officer's subjective beliefs concerning the suspect's status of custody weigh on the custody analysis. *Faux*, 828 F.3d at 135. Nor does informing a suspect that he is "free to leave" preclude a court from finding otherwise — *i.e.,* from concluding that the suspect was, in fact, in custody within the meaning of *Miranda* and its progeny. *See United States v. Familetti,* 878 F.3d 53, 59–60 (2d Cir. 2017) (noting that whether a defendant was told he was free to leave is "probative" but not "dispositive" in a *Miranda* custody analysis); *Newton*, 369 F.3d at 670 ("The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody."). However, an officer's knowledge or subjective beliefs are relevant to the custody determination if they were communicated or manifested to the suspect in a manner which may have affected whether the suspect felt free to leave. *Stansbury v. California*, 511 U.S. 318, 325 (1994); *see United States v. Ali*, 68 F.3d 1468, 1473 (2d Cir. 1995) ("In sum, an officer's views concerning the nature of an interrogation . . . may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." (quoting *Stansbury*, 511 U.S. at 325)). Importantly, a suspect who understands that his detention is unlikely to be temporary and feels that he is "'completely at the mercy of police' could reasonably deem [his] situation comparable to formal arrest." *Faux*, 828 F.3d at 135 (quoting

*Newton*, 369 F.3d at 675); *see also United States. v. Pence*, 172 F.4th 213, 218 (2d Cir. 2026).

Determining whether a person is in custody in their home presents additional difficulties. "The home is the most constitutionally protected place on earth; thus, the right to terminate the interrogation and be free to leave is hollow if the one place that the individual cannot retreat to, or exclude law enforcement from, is [his] home." *Faux*, 828 F.3d at 135 (citation modified) (quoting *United States v. Craighead*, 539 F.3d 1073, 1082–83 (9th Cir. 2008)). While numerous courts have concluded that a suspect questioned in his or her own home was not "in custody," even absent a formal arrest, the home may nevertheless become a custodial setting. *Faux*, 828 F.3d at 136; *see also Orozco v. Texas*, 394 U.S. 324 (1969); *Newton*, 369 F.3d 659; *Craighead*, 539 F.3d 1073. Although a reasonable person, having been told that he was not under arrest, would likely have understood that he would not be taken from his home to the police station, that same reasonable person may also have understood that "his freedom of movement, even within his home, would be restricted to a degree comparable to that of an individual placed under formal arrest." *Newton*, 369 F.3d at 677.

For example, in *United States v. Butt*, the court concluded that a suspect is subject to custodial interrogation in the home when the circumstances are closer to those where the suspect is "formally arrested and physically cut off from the outside world [rather] than the type of custody that sometimes accompanies questioning at roadside stops, airports, offices, and restaurants, where the margin for indiscretion

25

is more slim." No. 18-CR-00087 (NSR), 2019 WL 479117, at *16 (S.D.N.Y. Feb. 7, 2019) (finding custody where the suspect "was not only deprived of his normal sovereignty from his home, but he was also deprived of the protection of public scrutiny"); *see also id.* at *15 (noting that an individual can be "as isolated and cut off from the outside world within his home as he would have been had he been in some isolated police [s]ite" (citing *Craighead*, 539 F.3d at 1077)).

Cruz makes two distinct arguments for the suppression of the statements made during the interrogation at his home on August 24, 2021. First, he argues that the statements should be suppressed because he was subjected to custodial interrogation but was not given *Miranda* warnings. Cruz Mot. to Suppress at 16–23. Second, he argues that his pre-arrest statements should be suppressed because they were involuntary. *Id.* at 23. Because the Court agrees that Cruz was subjected to custodial interrogation in his home without being provided with the required *Miranda* warnings, these statements must be suppressed, and the Court need not reach Cruz's alternative claim of involuntariness.

### a. Cruz Was in Custody During the August 24, 2021 Interrogation in His Home

The government contends that the facts averred in Cruz's motion to suppress, even if taken as true, fail to objectively establish that Cruz was in custody during the approximately one hour in which law enforcement interrogated him in his bedroom about his use of the -1304 phone and the child-exploitation crimes for which he was the prime suspect. Gov't Opp'n at 44. The Court disagrees.

The government is correct that several factors in the "totality of the circumstances" analysis weigh against finding that Cruz was in custody. Cruz was never placed in handcuffs or subjected to physical force; he was told in Spanish and English that he was not under arrest; the interrogation took place inside his home; and Cruz was not arrested at its conclusion. The Court acknowledges that these circumstances alone could lead a reasonable person in Cruz's situation to understand that he was in fact free to leave. *See e.g., Newton*, 369 F.3d at 672, 677; *FNU LNU*, 653 F.3d at 153; *Stansbury*, 511 U.S. at 325. And there are certainly some similarities between Cruz's case and others in which the Second Circuit has found that an individual was not in custody while interrogated in their home. *See Faux*, 828 F.3d at 132 (distinguishing the circumstances of that case from those where home interrogations were held non-custodial and citing cases); *Familetti,* 878 F.3d at 59–60 (noting that the facts of that case presented a "close case" despite ultimately finding the interrogation non-custodial). There is no indication that the officers threatened Cruz during the interrogation to elicit responses to their questions. And finally, Cruz does not argue that he ever asked to terminate or leave the interrogation.

However, there are numerous other factors that distinguish Cruz's case from those in which the Second Circuit held that an interrogation was not custodial. Here, the circumstances of the August 24 warrant execution closely resemble a traditional arrest. Cruz was awoken before dawn to thirteen federal agents entering his apartment with their guns drawn. Cruz Mot. to Suppress at 9. Four of the officers

27

pointed their guns at Cruz and ordered him to put his hands up. *Id.* at 6. Cruz also never volunteered to be interviewed. *Id.* at 19. These facts clearly distinguish Cruz's case from both *Faux* and *Familetti*, where the court did not find custody in the home setting. In *Faux* and *Familetti*, law enforcement did not forcibly enter the suspect's home, and no weapons were ever drawn. *Faux*, 828 F.3d at 133; *Familetti*, 878 F.3d at 61. Here, Cruz's sons were ordered out of the home upon the agents' entry; in *Faux*, by contrast, the suspect's husband was allowed to remain in the next room while the agents spoke to her in the dining room. *Faux*, 828 F.3d at 137.

Moreover, three agents took Cruz to a back bedroom to be interrogated for approximately one hour. Cruz Mot. to Suppress at 4, 9. Two other armed officers stood guard at the entrance to the basement, and these officers blocked the apartment's only exit. *Id.* at 6. In the bedroom, the three agents positioned themselves between Cruz and the exit from the room. *Id.* at 20. Even though he was not in handcuffs, Cruz was in a closed room, out of public view, blocked by officers from both the exit of the bedroom and the apartment. These are precisely the type of indicia of domination and control that weigh heavily in favor of finding that a suspect was in custody. *FNU LNU*, 653 F.3d at 154–55; *see also Craighead*, 539 F.3d at 1086 (finding custody where the defendant, though not physically restrained, was blocked from the only exit by an armed detective, making it objectively reasonable for the defendant to believe he was not free to leave).

It is true that the officers at one point told Cruz that he was "free to leave" — but only in English. Cruz Mot. to Suppress at 7. And even after Cruz told them that

he did not understand at least some of what they were saying to him in English, the officers — who were aware that Spanish was Cruz's primary language — never communicated to him that he was free to leave in Spanish. *Id.* This fact weighs in favor of Cruz being in custody. *Yarborough v. Alvarado*, 541 U.S. 652, 653 (2004). Additionally, Cruz did not volunteer for or otherwise affirmatively indicate a willingness to be questioned after being given the choice to do so. *Cf. Pence*, 172 F.4th at 219 (noting that the defendant "was given a choice about whether to speak with the agents at all, and whether to do so in his home or in the FBI vehicle outside"). Instead, the agents only told Cruz he could respond "I don't know" if he did not remember — and then reminded him, more than once, that lying to the FBI is a federal crime. Cruz Mot. to Suppress at 8. These circumstances distinguish this case from others in which a court has found that a defendant was not in custody and voluntarily agreed to speak with officers executing a search warrant. *See, e.g.*, *United States v. Schaffer*, 851 F.3d 166, 170 (2d Cir. 2017) (finding, *inter alia*, that defendant was not in custody when he was interviewed during the workday in his office building by two FBI agents while others conducted a search of other parts of the office, during which none of the agents had their weapons drawn).

Finally, the nature of the interrogation itself is not "within the range of inquiries" that a reasonable person in Cruz's position would expect during a period of questioning in which he was truly free to leave. *FNU LNU*, 653 F.3d at 154. Cruz was interrogated for over an hour, unlike in *Familetti*, where the suspect was questioned for "at most several minutes" and in which the Second Circuit found the

question of custody to be a "close" one. *Familetti*, 878 F.3d at 61. The detailed, repeated questioning by the officers as to whether Cruz used the -1304 phone or suspected social media handles, including telling Cruz "[w]e know you were on Snapchat" and that they specifically "kn[e]w" that he had been exchanging Snapchat messages with an underaged girl, First Interrogation Audio at 15:00–18:00, would lead a reasonable person to recognize those questions as relevant to a potential criminal charge against him, *see FNU LNU*, 653 F.3d at 154–55 (the fact that "a reasonable person would recognize all [the officer's] questions as relevant to [defendant's] admissibility to the United States" is relevant to whether the "content of the officer's questions substantially inform whether a reasonable person would feel restrained in a way similar to a formal arrest"). Specifically, showing Cruz chat records and photographs of the victims, effectively displaying the evidence officers believed inculpated him in serious federal crimes against children, certainly would not assure Cruz that he would be free to leave after he finished answering the officers' questions. The officers clearly manifested their beliefs concerning Cruz's culpability, and in combination with the multitude of other factors, a reasonable person in Cruz's circumstances would believe that he was not free to unilaterally terminate the interrogation and leave. *Stansbury*, 511 U.S. at 325.

In addition to the Second Circuit cases discussed above, the Court also notes certain parallels between Cruz's case and those in other circuits in which courts have found a defendant was subject to a custodial interrogation inside the home even absent a formal arrest. *See e.g.*, *United States v. Herran*, No. 20-10157, 2021 WL

30

5027488, at *2 (9th Cir. Oct. 29, 2021) (finding custody in the home despite defendant being told he was free to leave, because "[t]he length of interrogation, the number of armed agents, and the way in which the agents directed and escorted the defendant around his own property turned the otherwise comfortable and familiar surroundings of the home into a police-dominated atmosphere" (citation modified)); *United States v. Hashime*, 734 F.3d 278, 283–84 (4th Cir. 2013) (defendant was in custody in his home given the armed forced entry of several officers into his home and the isolation during a three-hour interrogation, notwithstanding being told he was free to leave and not under arrest); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding custody in the home without handcuffs or a formal arrest based on the totality of coercive circumstances, including an early-morning search by eight armed officers, an unholstered weapon drawn in the defendant's bedroom, and continuous physical control over the defendant). And district courts in this circuit have reached similar conclusions on analogous facts, viewed in totality. *See, e.g.*, *Butt*, 2019 WL 479117, at *12–18 (noting that the "number of officers that conducted the search, the way the search was executed, and the optics of the search—including the four law enforcement agencies from which the 16 officers drew—would be enough to overwhelm a suspect and make the suspect feel a loss of the usual autonomy one has on their home."); *United States v. Montoya*, 760 F. Supp. 37, 39–40 (E.D.N.Y. 1991) (declining to suppress evidence after defendant gave valid consent to search his home, yet finding defendant was "not free to leave" despite the absence of a formal arrest,

31

in light of the fact that officers, *inter alia*, isolated the defendant in his apartment and affirmatively indicated that he was a suspect in their investigation).

For these reasons, then, the Court finds that a reasonable person in Cruz's situation would not have considered himself free to leave and would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. Accordingly, Cruz was "in custody" within the meaning of the Fifth Amendment while interrogated at his home in the early morning hours of August 24, 2021. Because Cruz was not advised of his *Miranda* rights before the interrogation began, his motion to suppress the statements he made on August 24, 2021 is granted.

## II. April 13, 2023 Post-Arrest Statements

Cruz next moves to suppress the post-arrest statements he made to law enforcement at the police station on April 13, 2023, contending that they were obtained using a "deliberate, two-step strategy" to undermine *Miranda* and deprive Cruz of his rights under the Fifth Amendment, in violation of the Supreme Court's decision in *Missouri v. Seibert*, 542 U.S. 600 (2004).

The Supreme Court has laid out two approaches to determine where — as here — "a confession obtained after a Miranda warning but [which was] preceded by the suspect's earlier, unwarned incriminating statements" may be subject to suppression. *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007) (citing *Missouri v. Seibert*, 542 U.S. 600 (2004) and *Oregon v. Elstad*, 470 U.S. 298 (1985)). Under the first approach, laid out in *Elstad,* a post-warning confession is admissible despite an involuntary pre-warning statement unless the post-warning confession was also

involuntary. *Id.* at 534. For the statements or confession to be admissible, Cruz must have been "fully advised of his rights and . . . knowingly and voluntarily waived them." *United States v. Moore*, 670 F.3d 222, 233 (2d Cir. 2012).

As to the second framework, the Second Circuit has adopted Justice Kennedy's two-fold approach in *Seibert* for cases in which a court finds that law enforcement intended to undermine *Miranda*'s protections by obtaining a second inculpatory statement from a suspect who had been given the required warnings, but only after an earlier interrogation in which no such warnings were provided. *United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010). Specifically, a statement made by a suspect during a custodial interrogation, after a *Miranda* warning has been provided, must nevertheless be suppressed if the statement is the product of a "deliberate, two-step strategy, predicated upon violating *Miranda*." *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring).

Under the *Seibert* approach, the Court's first task is to determine "whether law enforcement officers used a 'deliberate two-step strategy' in 'a calculated way to undermine the *Miranda* warning,' . . . and 'to obscure both the practical and legal significance of the admonition when finally given.'" *Id.* (quoting *Seibert*, 542 U.S. at 620, 622 (Kennedy, J., concurring)). The *Seibert* plurality identified the following factors to guide the deliberateness inquiry: "(1) the completeness and detail of the questions and answers asked in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and second interrogation, (4) the continuity of police personnel, and (5) the degree to which the

interrogator's questions treated the second round as continuous with the first." *Capers*, 627 F.3d at 475 (quoting *Seibert*, 542 U.S. at 615).

In doing so, courts must consider the "totality of the objective and subjective evidence surrounding the interrogations, guided by—but not limited to—the factors identified by the plurality in *Seibert*." *Moore*, 670 F.3d at 229 (citation modified). The Second Circuit also recognizes that in most instances the first inquiry will rely heavily on objective evidence to determine deliberateness, although the totality of the subjective and objective evidence should be considered. *Capers*, 627 F.3d at 479. The burden rests on the government to "disprove deliberateness" by a preponderance of the evidence. *Id.* at 479–80.

If the Court finds that law enforcement used such a deliberate strategy in its first inquiry, it then turns to the second *Seibert* inquiry: "whether any curative measures were taken to ensure that a reasonable person in the suspect's situation would understand" the importance and effect of both the *Miranda* warning and waiver. *Id.* (quoting *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring) (citation modified)). Two potential curative measures noted in *Seibert* include (1) "a substantial break in time and circumstances between the prewarning statement and the Miranda warning" and (2) "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Capers*, 627 F.3d at 476 (citation modified).

If law enforcement did not use a deliberate two-step interrogation strategy to render the *Miranda* warnings and subsequent waiver ineffective, the Court is guided

by the voluntariness standard set forth in *Elstad*. *See Capers*, 627 F.3d at 466. The post-warning statements must constitute a valid knowing and voluntary waiver of the right to remain silent. *Elstad*, 470 U.S. 298; *see also Moore*, 670 F.3d at 230 (post-warning statements will be admissible if they were made voluntarily).

In Cruz's case, the Court makes the following findings. First, it agrees with Cruz that the law enforcement team employed a deliberate, two-step strategy to undermine *Miranda*. As to *Seibert*'s second prong, however, while it is a close question, the Court finds that the agents' ultimate curative measures — in particular, the twenty month gap between the two interrogations — were sufficient to ensure that a reasonable person in Cruz's situation would understand the importance and effect of both the *Miranda* warning and subsequent waiver when they were finally given. The Court also finds that Cruz knowingly and voluntarily waived his *Miranda* rights after his arrest on April 13, 2023. Accordingly, Cruz's motion to suppress his April 13, 2023 statements is denied.

### a. The August 24, 2021 and April 13, 2023 Interrogations Were a Deliberate, Two-Step Strategy to Avoid the Requirements of *Miranda*

With respect to Cruz's *Seibert* claim, the first question for the Court to resolve is whether Cruz's post-arrest and post-warning statements made at the police station on April 13, 2023 were the product of a "deliberate, two-step strategy, predicated upon violating *Miranda*." *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring). The parties do not dispute that Cruz was subjected to custodial interrogation on that date, and

that he was advised of his *Miranda* rights after his arrest and before the interrogation began.

Cruz argues that the objective factors support a finding of deliberateness under *Seibert* because: (1) "the first [un-*Mirandized*] interrogation of Cruz lasted over an hour and went into detail regarding key elements of the charged conduct"; (2) "during the second [post-*Miranda*] interrogation in an FBI interrogation room, Agent Thompson explicitly referred back to that first interrogation"; and (3) "Agent Thompson was the lead interrogator during both interrogations and his overlapping questions and repeated references to Cruz's prior statements during the second interrogation rendered it a continuation of the first." Cruz Mot. to Suppress at 28–32. The government does not contest that these factors weigh in favor of deliberateness but instead argues the twenty-month separation between the first and second interrogations "conclusively refutes" any deliberateness. Gov't Opp'n at 40.

Looking at the totality of the circumstances, the evidence cited by the government to show that Cruz was not the subject of a deliberate, two-step interrogation is outweighed by subjective and objective evidence to the contrary. The Court finds that factors one, two, four, and five weigh in favor of deliberateness. *See Capers*, 627 F.3d at 475 (laying out these factors). The Court recognizes that the third factor, the timing and setting of the first and second interrogation, weighs against a finding of deliberateness. Yet in a totality of the circumstances analysis, it does not outweigh all other indications of deliberateness. *See id.* at 478 (noting that,

in the *Seibert* analysis, no one factor is dispositive, and these factors are not exhaustive).

As to the first factor, "the completeness and detail of the questions and answers in the first round of interrogation," *Capers*, 627 F.3d at 475, the agents who entered Cruz's home in August 2021 questioned him for more than an hour. Cruz Mot. to Suppress at 9. They asked questions concerning the -1304 phone, the Snapchat account they were investigating, and Cruz's other online activity. Cruz Mot. to Suppress at 6–8 (citing First Interrogation Audio). The agents also showed Cruz printouts of chat records and photographs of minor victims as part of the questioning. *Id.* at 8 (citing First Interrogation Audio). This first interrogation was thorough and detailed, and the fact that agents came prepared with printouts to aid their interrogation makes clear that they had planned in advance to conduct a thorough interrogation of Cruz and confront him with numerous items of evidence gathered during an investigation that Agent Jensen and others had conducted for many months before executing the warrant. Yet they deliberately chose not to *Mirandize* Cruz prior to the questioning.

As to the second factor, "the overlapping content of the two statements," *Capers*, 627 F.3d at 475, the statements Cruz made in each interrogation appear to overlap substantially. In the first interrogation, these statements included admissions that Cruz had used the -1304 phone, had used certain social media accounts, and that he had participated in chats and video calls with minors. Cruz Mot. to Suppress at 8; Gov't Opp'n at 15. In the second interrogation, these

statements included admissions that Cruz used the -0478 phone and that "it could be" him communicating over Snapchat with one of the complainants, as well as Cruz's statement that a male depicted in an image recovered from the -1304 appeared to be a minor. Gov't Opp'n at 20 (citing Second Interrogation Audio); Second Interrogation Audio at 30:05–31:55 (containing Cruz's statement that the person depicted appeared to be "eleven or twelve"). While the statements are not identical, they are markedly similar in subject matter and content.

As to the third factor, "the timing and setting of the first and second interrogation," *Capers*, 627 F.3d at 475 (citation modified), the second interrogation occurred twenty months after the first and in a different location — namely, at the FBI's New York office, while the first interrogation was at Cruz's home. Cruz Mot. to Suppress at 9. These are significant differences between the two interrogations.

As to the fourth factor, "the continuity of police personnel," *id.*, the first interrogation included Agent Thompson, Agent Jensen, and NYPD Officer George Munoz, Cruz Decl. ¶ 10; Cruz Mot. to Suppress at 6. The second interrogation involved Agent Thompson and Special Agent Erma Flores, who acted as an interpreter. *Id.* at 9. Notably, Agent Thompson acted as the primary interrogator in both interrogations, *see* First Interrogation Audio; Second Interrogation Audio, which represents a significant continuity of personnel between the two interrogations.

Finally, the fifth factor, "the degree to which the interrogator's questions treated the second round as continuous with the first," *Capers*, 627 F.3d at 475, strongly favors a finding of deliberateness. Agent Thompson made repeated reference

38

to the first interrogation during the second interrogation, Cruz Mot. to Suppress at 10 (citing Second Interrogation Audio). Agent Thompson also personally questioned Cruz about many of the same topics in the second interrogation as he had in the first interrogation, including showing Cruz transcripts of online chats and asking questions about Cruz's social media accounts and online activity. *Id.* at 11 (citing Second Interrogation Audio). While doing so, Agent Thompson repeatedly referenced the earlier interrogation, reminding Cruz about things that he and Cruz had said to one another on these same topics, and urging him to reaffirm what he had previously told investigators. For example:

> [1] So *the last time we spoke*, I said you need to be honest with us. You weren't completely honest with us, and that's one of the reasons you're here today. *And as I said*, our number one goal is to get the monsters out there. And we don't think you're that person, but we'd like your help.
>
> [2] Well, *last time we spoke, you said that was the name of the account.*
>
> [3] *Remember you and I spoke before, at your old house. Do you remember that?* That's what I'm talking about. *That's what we were talking about. The first time we spoke you said this was your account.*
>
> [4] This is the account, *last time you said this was your account . . . . Do you remember that? Last time you told us this was your account.*

*Id.* (emphasis added).

Thus, under the totality of the circumstances, the *Seibert* factors weigh strongly in favor of a finding of deliberateness on the part of the interrogating agents, notwithstanding the third factor (the elapsed time and change in location) cutting the other way. The agents' obvious preparation to interrogate Cruz during the August 24 execution of the warrant, their failure to *Mirandize* Cruz before questioning him,

and Agent Thompson's repeated and specific references back to the first interrogation evince this deliberateness.

In addition to the substantial evidence of deliberateness from the four *Seibert* factors, the Court gives considerable weight to the broader factual context asserted in the Cruz's motion to suppress. Cruz has alleged — and the government has not here meaningfully disputed, *see* Gov't Opp'n at 41 n.7 — that Agent Thompson and other members of the law enforcement task force assigned to child sexual exploitation investigations in this district "have systematically extracted un-*Mirandized* statements from suspects while purportedly executing search warrants for over a decade." Cruz Mot. to Suppress at 30 (citing cases). These allegations paint a picture far more troubling than a single, isolated attempt to circumvent *Miranda*. Deliberately withholding *Miranda* warnings in an initial interrogation across multiple investigations and over an extended period of time by members of the same FBI task force suggests that the "interrogate first, warn later" approach used in Cruz's case was not the product of negligence, oversight, or an agent acting outside the bounds of established practice. And this is exactly the kind of deliberate, systemic effort to circumvent the Fifth Amendment's guarantees that *Seibert* was intended to deter.

Notably, the government cites no evidence to rebut Cruz's contention that the two-step interrogation strategy was deliberate, except to argue that deliberateness is essentially inconceivable because of the temporal gap. Gov't Opp'n at 40–41. Yet the government's position is undermined by the fact that despite (or arguably, because

40

of) the passage of time, Agent Thompson repeatedly referred back to the first interrogation and statements from twenty months earlier that he urged Cruz to "remember" and adopt anew. Cruz Mot. to Suppress at 10. All of this strongly indicates that Agent Thompson was deliberately attempting to elicit some version of the same incriminating statements that Cruz made during the first, un-*Mirandized* interrogation, or to convey to Cruz that invoking his Fifth Amendment privileges would be futile as a practical matter because he had previously admitted to the same conduct that the agents sought to question him about when they placed him under arrest.

As a result, the Court agrees with Cruz that, under the totality of the circumstances, the record shows that Agent Thompson and his colleagues engaged in a deliberate "interrogate first, warn later" strategy intended to circumvent Cruz's *Miranda* rights, and that the government has failed to establish otherwise. *See Capers*, 627 F.3d at 479 ("[T]he burden rests on the prosecution to disprove deliberateness.").

### b. Sufficient Curative Measures Were Implemented

Because the Court finds that the officers used a deliberate two-step strategy to evade *Miranda*, the remaining question is "whether any curative measures were taken to ensure that a reasonable person in the suspect's situation would understand" the importance and effect of both the *Miranda* warning and waiver at the time they were finally given in April 2023. *Capers,* 627 F.3d at 476 (citation modified) (quoting *Seibert*, 542 U.S. at 620 (Kennedy, J., concurring)).

In his opinion in *Seibert,* Justice Kennedy emphasized that a "substantial break in time and circumstances" between the pre-warning statement and the subsequent *Miranda* warning "may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring). Here, there were both a significant gap in time *and* a change in the location and circumstances of the interrogation. *See Moore*, 670 F.3d at 232–33 (finding that a ninety-minute gap between interviews provided a "break in momentum" that was enough for the defendant "to appreciate that he retained the right to remain silent"); *United States v. Tirado*, No. 17-CR-668 (GHW), 2018 WL 3432040 at *20 (S.D.N.Y. July 16, 2018) (finding that a ninety-minute gap and an intermediate stop at a different police precinct was sufficient to establish the discontinuity of the interrogation). And Cruz's second interrogation was far more temporally removed than in these cases — a full twenty months after the first un-*Mirandized* interrogation. The second interrogation also took place at a different location, namely the FBI's New York office.

Indeed, Cruz has not identified any cases, from any jurisdiction, in which a court found a *Seibert* violation despite a time difference between the two interrogations anywhere close to the twenty-month separation here. Nor has this Court identified any; instead, it appears that (at least in published decisions) the longest gap between unwarned interrogations and those in which *Miranda* warnings were given in which the court suppressed the second statements under *Seibert* involved a break in time of just one day. *Reyes v. Lewis*, 833 F.3d 1001, 1032 (9th Cir.

2016) (finding, in the course of a *Seibert* analysis, that "[t]he psychological, spatial, and temporal break between the unwarned and warned interrogations was not enough to cure the *Miranda* violation" when the second, warned interrogation took place one day after the initial, unwarned interrogation); *cf. Carter*, 489 F.3d at 538 (affirming a district court's rejection of a *Seibert* claim where, *inter alia*, "over an hour" elapsed between the defendant's two statements). Similarly, Cruz has not identified any cases, and this Court is aware of none, in which the later-in-time statements were suppressed despite the fact that the second interrogation took place in an entirely different location than the first.

Ultimately, then, despite the agents' deliberate actions in this case, and the representations made by Cruz's experienced counsel regarding a broader pattern in which the members of these particular law enforcement teams have attempted to circumvent *Miranda* when investigating child exploitation suspects through the same two-step approach exhibited here, the Court is constrained to conclude that *Seibert* and its progeny do not permit suppression of Cruz's post-arrest statements. Other factors present here, standing alone, would likely warrant a different conclusion. And to be sure, nothing in the Second Circuit or Supreme Court's cases suggests that either changing locations or a gap in time exceeding one day will necessarily cure the defects of an earlier, unwarned interrogation. But absent some authority to the contrary, the Court finds that the twenty-month break in time and corresponding change in location between the first and second interrogations were sufficiently curative measures that enabled Cruz to distinguish between the two

rounds of questioning and to make a knowing and voluntary choice about whether to waive his Fifth Amendment rights at the time of his arrest. Accordingly, the Court finds that there was no *Seibert* violation that warrants suppression of Cruz's post-*Miranda* statements made on April 13, 2023.

### c. Cruz's April 13, 2023 Waiver of His *Miranda* Right Was Voluntary

Alternatively, Cruz moves to suppress the post-arrest statements he made to law enforcement at the police station on April 13, 2023 on the ground that his waiver of *Miranda* rights was neither knowing nor voluntary. Cruz Mot. to Suppress at 32.

If the government seeks to admit post-warning statements made during a custodial interrogation, it must establish, by a preponderance of the evidence, that the suspect "knowingly and voluntarily waived [his *Miranda*] rights" before making incriminating statements. *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019). This analysis has two parts. The suspect's *Miranda* waiver must be both "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, *and* must be knowing in the sense that it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (citation modified) (emphasis added) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The suspect's waiver may be express or implied through his "actions or words." *Id.* Regardless of an express or implied waiver, the "prosecution must make the additional showing that the accused understood these rights." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

As noted above, it is undisputed that Cruz was subject to custodial interrogation during his post-arrest interrogation in April 2023, and that Cruz was given his *Miranda* warnings before the interrogation began. Thus, the question is whether Cruz knowingly and voluntarily waived his *Miranda* rights. *Moore*, 670 F.3d at 233.

First, the Court must determine whether Cruz's waiver was the "product of a free and deliberate choice." *O'Brien*, 926 F.3d at 73. To support his contention that the waiver was coerced, Cruz asserts that Agent Thompson misrepresented the waiver as mere "administrative stuff," minimizing its legal significance to manipulate Cruz into signing. Cruz Mot. to Suppress at 32–33. He argues that this framing disarmed his suspicion, prevented meaningful understanding or deliberation, and deprived him of time to review the waiver form or ask questions about its contents and implications. *Id.* at 33.

However, Cruz was informed of his rights orally in Spanish, before he ever signed the Spanish-language waiver, and yet did not invoke his rights to silence or to consult with counsel. Cruz Mot. to Suppress at 9; Gov't Opp'n at 17–18. Moreover, the government contends, and Cruz does not dispute, that Agent Thompson asked Cruz, and Agent Flores translated into Spanish, "Do you understand your rights?" prior to Cruz's signing the Spanish-language *Miranda* waiver form. Gov't Opp'n at 16. Both the Supreme Court and Second Circuit have held that this is enough to find that a defendant's waiver of *Miranda* rights was knowing and voluntary. *See Colorado v. Spring*, 479 U.S. 564, 573 (1987) (holding that the defendant's "decision

to waive his Fifth Amendment privilege was voluntary" where the defendant did not allege coercion or intimidation on the part of law enforcement and the defendant was advised verbally of his rights prior to signing a written waiver); *United States v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011) ("Consistent with *Miranda*, all criminal defendants must be apprised of certain rights before a custodial interrogation may begin, including, of course, the right to remain silent and be afforded the assistance of counsel. But once those warnings are properly administered . . . a defendant is left to make his own choice as to how best to proceed."); *United States v. Male Juvenile (J.B.)*, 121 F.3d 34, 41 (2d Cir. 1997) (waiver was knowing and voluntary where agent "twice explained to defendant that he could remain silent and that anything he said could be used against him" and twice explained to defendant that he had a right to an attorney and explained that he could speak to his mother before further questioning," at which point defendant "declined to speak to his mother and instead signed the waiver form"). Here, Cruz was provided with substantive *Miranda* warnings prior to signing the waiver. And Agent Thompson's mischaracterization of the warnings as "administrative stuff" — even if construed as a deliberate attempt to minimize the significance of the constitutional rights he was trying to induce Cruz to waive, which it may well have been — does not constitute the kind of egregious intimidation, coercion, or deception that would render Cruz's *Miranda* waiver involuntary.

Second, Cruz argues that the waiver was not made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to

abandon it." *O'Brien*, 926 F.3d at 73. However, Cruz was read his *Miranda* rights in Spanish and presented with a Spanish language *Miranda* waiver form, which he then signed. Cruz Mot. to Suppress at 9; Gov't Opp'n at 17–18. Cruz cites *United States v. Male Juvenile (J.B.)*, 121 F.3d 34, 41 (2d Cir. 1997) in support of this element, arguing that *J.B.* involved a holding by the Second Circuit "that a waiver was not knowing where the defendant's lack of sophistication and failure to comprehend the consequences weighed against voluntariness." Cruz Mot. to Suppress at 33. However, the *J.B.* Court held that the defendant's waiver *was* knowing, despite evidence that defendant had attentional and learning disabilities. 121 F.3d at 40–41. Here, Cruz provides no such evidence of a lack of competency aside from limited English and lack of experience with law enforcement. This does not rise to the level of a lack of competency required to find that a *Miranda* waiver was involuntary, particularly since Cruz's rights were read to him in Spanish and he was provided with a Spanish-language waiver form. *See J.B.*, 121 F.3d at 40 (noting that, for a finding of involuntariness, the evidence must show "that defendant was so incompetent that he was not aware 'both of the nature of the right being abandoned and the consequences of the decision to abandon it'" (quoting *Spring*, 479 U.S. at 573)); *Toste v. Lopes*, 701 F. Supp. 306, 313–14 (D. Conn. 1987) (holding that evidence the petitioner was "mildly" developmentally disabled and of "dull normal intelligence" did not show an inability to knowingly waive his rights), *aff'd*, 861 F.2d 782, 783 (2d Cir.1988); *cf. United States v. Garibay*, 143 F.3d 534, 537–39 (9th Cir. 1998) (finding a *Miranda* waiver was involuntary where, *inter alia*, the defendant (1) had a "low

47

IQ"; (2) had limited English proficiency but was only read his rights in English and was offered neither a written waiver to read or offered the services of a translator; and (3) "had no previous experience with the criminal process" and his "personal life experiences do not indicate that he was familiar with his *Miranda* rights and his option to waive those rights").

As the government notes, Cruz need not "know and understand every possible consequence of a waiver," and instead must recognize only that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Spring*, 479 U.S. at 574. Here, those requirements were met, as Cruz was orally informed of his rights in Spanish and subsequently was able to read and sign a form laying out his rights, again in Spanish. Thus, the government has shown, by a preponderance of evidence, that Cruz's *Miranda* waiver was knowing and voluntary.

Accordingly, because the record establishes that (1) the government implemented sufficient curative measures to avoid a *Seibert* violation and (2) Cruz's waiver of his *Miranda* rights was knowing and voluntary, Cruz's motion to suppress his April 13, 2023 statements is denied.

## **CONCLUSION**

For the foregoing reasons, Cruz's motion to suppress his statements to law enforcement officials under the Fifth Amendment to the United States Constitution is granted in part and denied in part. The Court continues to reserve decision on Cruz's Fourth Amendment claims challenging the constitutionality of the August 23,

2021 warrant and the April 13, 2023 search of Cruz's cell phone; the Court will decide this portion of Cruz's motion by separate order at a later date.

**SO ORDERED.**


Dated:  August 6, 2026                            */s/ Nina R. Morrison*
       Brooklyn, New York                    Nina R. Morrison
                                   United States District Judge